IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-04083-01-CR-C-BCW |
| | ) | |
| DUSHANE KWMANIE GRIFFITH, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Pending before the Court is defendant Dushane Kwmanie Griffith's Motion to Suppress Evidence. (Doc. 28). The Government has filed suggestions in opposition (Doc. 32). For the reasons that follow, it is recommended that Defendant's motion be granted in part, and denied in part.

## I. Background

On October 29, 2017, Columbia Police (CPD) received a 911 call reporting suspicious activity in a public park. The caller described a gray Oldsmobile located next to a public restroom in the park, and explained the three occupants of the vehicle were engaged in "strange activity." (Doc. 32). The caller also noted that one of the individuals appeared to match the description of a wanted burglary suspect. CPD Officer Austin Wagenhauser responded to the call shortly thereafter, parked his patrol vehicle near Shepard Boulevard Park (Shepard Park), and waited for backup. (Doc. 28; Doc. 32). Minutes after arriving, the officer spotted a gray Oldsmobile that appeared to be leaving Shepard Park. (Doc. 32). According to Officer Wagenhauser, the vehicle attempted to evade police contact after spotting his police vehicle. He then initiated a traffic stop. *Id.*

During the stop, the officer made contact with the three occupants of the vehicle. He identified the individuals and recognized the Defendant as a felon with known gang ties. The officer ultimately decided to detain the individuals and search the vehicle. As part of the search,

Officer Wagenhauser forcefully opened a locked glove box and recovered a handgun and prescription bottle bearing the Defendant's name. The substance within the bottle tested positive for PCP. *Id.* Mr. Griffith, who had been sitting in the front passenger seat, was then arrested. However, he was never informed of his *Miranda* rights. (Doc. 28). In response to numerous questions posed by CPD officers, the Defendant made several incriminating statements. The Defendant also made spontaneous incriminating statements after the initial interrogation. (Doc. 32).

The evidence recovered during the traffic stop and subsequent non-Mirandized statements lead to a two-count indictment in which Mr. Griffith was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), and an unlawful user of a controlled substance in possession of a firearm in violation of 18 U.S.C. § 922(g)(3). (Doc. 1). Mr. Griffith now moves for an order suppressing both the evidence obtained during the investigative stop and his incriminating statements that followed. (Doc. 28).

The Court held an evidentiary hearing regarding the motion to suppress on January 31, 2019. (Doc. 38). Mr. Griffith was represented by Attorney Steven R. Berry. The Government was represented by Assistant United States Attorney Jim Lynn. The Government called Officer Wagenhauser as a witness. The defense called no witnesses to testify.

## II.  **Findings of Fact**

On the basis of the evidence presented at the evidentiary hearings, the undersigned submits the following proposed findings of fact.

1. Officer Austin Wagenhauser is patrol officer for the CPD and has been employed in that capacity for two-and-a-half years. (Tr. at 4:5-13; 5:1-6, January 31, 2019).
2. On October 29, 2017, at 6:05 p.m., a Columbia citizen called 911 to report a suspicious vehicle in Shepard Park, which is located at 2717 Shepard Boulevard in Columbia, Missouri. (Gov't Exhibit No. 1). The caller stated that a gray, four-door Oldsmobile had driven by the park repeatedly before ultimately parking by the public restrooms. (Tr. at 12:3-9, January 31, 2019; Gov't Exhibit No. 1). She described the occupants of the vehicle as a heavy-set black male in his thirties wearing a white jacket with black arms and navy pants, a black female, and an unidentified third party. *Id.* While parked, the subjects continuously entered and exited the vehicle without using the facilities. (Tr. at 11:5-9,

January 31, 2019; Gov't Exhibit No. 1). The caller believed the black male matched the description of a wanted burglary suspect and was concerned because there were numerous children present at the park at that time. (Tr. at 12:8-12, January 31, 2019; Gov't Exhibit No. 1).

3. Shepard Park is a public park with a playground, and is located on a dead-end street. (Tr. at 11:15-22; 52:4-5, January 31, 2019; Gov't Exhibit No. 2). The park is situated in a secluded, middle to upper class neighborhood and sits directly across from an elementary school. *Id.*

4. Officer Wagenhauser learned of the information provided by the caller via dispatch notes, and at approximately 6:17 p.m. responded to Shepard Park to investigate the call regarding the suspicious vehicle. (Tr. at 5:7-10; 6:2-4, January 31, 2019; Gov't Exhibit No. 1).

5. Officer Wagenhauser arrived at Shepard Park alone in his marked patrol vehicle at approximately 6:28 p.m. and parked facing eastbound on Shepard Drive to await backup. (Tr. at 6:7-21, January 31, 2019). At this time, it was dusk and Officer Wagenhauser testified that there was clear visibility. (Tr. at 14:1-4, January 31, 2019).

6. At 6:30 p.m., Officer Wagenhauser observed a vehicle that matched the caller's description approach traveling westbound on Shepard Boulevard. (Tr. at 14:6-9, January 31, 2019; Gov't Exhibit No. 1, Gov't Exhibit No. 4). The vehicle came to a full stop at the stop sign located at the intersection of Shepard Boulevard and Audubon Drive and then proceeded to turn left. (Tr. at 14:6-14, January 31, 2019; Gov't Exhibit No. 4).

7. Officer Wagenhauser believed the vehicle attempted to evade police contact by turning left on Audubon Drive because, in his opinion, the most direct route out of the park would have been continuing westbound on Shepard Boulevard. (Tr. at 15:1-6, January 31, 2019). Additionally, after the car turned left on Audubon Drive, Officer Wagenhauser believed the vehicle traveled over the residential speed limit of twenty-five miles per hour to distance itself from his marked patrol vehicle. (Tr. at 15:7-15, January 31, 2019; Gov't Exhibit No. 4).

8. Officer Wagenhauser then decided to perform an investigatory traffic stop. (Tr. at 38:10-19, January 31, 2019). Officer Wagenhauser caught up to the vehicle and engaged his emergency lights to effectuate the traffic stop near Mallard Court and Audubon Drive at

6:31 p.m. (Tr. at 15:16-20, January 31, 2019; Gov't Exhibit No. 4). The suspect vehicle did not stop immediately. (Tr. at 18:5-12, January 31, 2019; Gov't Exhibit No. 4).

9. The suspect vehicle ultimately came to a complete stop near the 2500 block of Mallard Court where Officer Wagenhauser approached and contacted its three occupants. (Tr. at 18:15-18, January 31, 2019; Gov't Exhibit No. 4). Officer Wagenhauser identified the driver as Chanell Wilkins, the front passenger as defendant Dushane Griffith, and the rear passenger as Morgan Johnson. (Tr. at 18:19-25 – 19:1-6). However, Morgan Johnson initially gave Officer Wagenhauser false identifying information and appeared reluctant to answer his questions. (Tr. at 19:21-25; 20:1-10, January 31, 2019; Gov't Exhibit No. 3).

10. After identifying the three occupants, Officer Wagenhauser returned to his patrol vehicle and ran their names through the Boone County Joint Communications system. The officer learned that Mr. Wilkins' driver's license was revoked and Mr. Griffith was on probation for unlawful use of a weapon. (Tr. at 20:11-17, January 31, 2019).

11. Officer Wagenhauser was familiar with Mr. Griffith from CPD records and knew that the Defendant was affiliated with a local gang, a felon, and known to possess narcotics. (Tr. at 19:12-20; 54:14-19, January 31, 2019).

12. Officer Wagenhauser informed the vehicle's occupants that they were being detained. (Tr. at 55:19-21, January 31, 2019; Gov't Exhibit No. 3).

13. Based off of the initial report of suspicious activity, the fact that the vehicle appeared to come to a slow stop once the traffic stop was initiated, Mr. Griffith's active probation for unlawful use of a weapon, and Ms. Johnson's reluctance to identify herself, Officer Wagenhauser decided to frisk all occupants in the vehicle. (Tr. at 20:18-24, January 31, 2019). There were no items recovered from the frisk of the three individuals' person. (Tr. at 20:3-10, January 31, 2019).

14. A backup officer supervised the three occupants while Officer Wagenhauser searched the interior of the vehicle. (Tr. at 20: 11-21, January 31, 2019; Gov't Exhibit No. 3). Officer Wagenhauser used force to open a locked glove compartment near the front passenger's seat. (Tr. at 21:22-25 – 22:1-13, January 31, 2019; Gov't Exhibit No. 3). Inside he located a Taurus, .40 caliber handgun next to a prescription bottle bearing Mr. Griffith's name. *Id.* The bottle contained a yellow substance which field-tested positive for PCP. *Id.*

15. Because Mr. Griffith was not allowed to possess a firearm as a felon, Officer Wagenhauser decided to arrest him. (Tr. 22:14-21, January 31, 2019; Gov't Exhibit No. 3). However, Officer Wagenhauser did not advise the Defendant of his *Miranda* rights at any time during their encounter on October 29, 2017. (Tr. at 22:22-25 – 23:1-4; 56:2-5, January 31, 2019). Immediately before placing Mr. Griffith in the patrol vehicle, Officer Wagenhauser directly asked the Defendant "Whose gun is it?" and "[w]hose PCP is it?" (Gov't exhibit No. 3). In response, Mr. Griffith proclaimed that "[i]t's not mine!" *Id.*

16. Mr. Griffith remained seated in the rear of Officer Wagenhauser's patrol vehicle at the scene of the traffic stop while a citation for driving while revoked was issued to the driver of the vehicle. (Tr. at 24:3-5, January 31, 2019). The two other occupants of the vehicle were then released without further incident. (Tr. at 23:7-11, January 31, 2019).

17. Officer Wagenhauser and another CPD officer engaged in dialogue with Mr. Griffith while he was seated in the patrol car at the scene of the traffic stop. (Tr. at 23:12-25 – 24:21, January 31, 2019; Gov't Exhibit No. 3).

18. During the course of the conversation at the scene, both CPD officers asked the Defendant a series of questions such as:
    a. "Whose gun is it?"
    b. "Why are you taking the fall cause no one else is?"
    c. "Don't you think it's suspicious you're a known gang member, you're on P&P for drugs and weapons, and there's both right in front of you?"
    d. "Did you smoke 'wet' earlier?"
    e. "So you're telling me your DNA isn't on the gun?"
    f. "How often do you use?"
    
    (Tr. at 24:12-21; 56:22-25 – 57:1-25; 58:25-59:1-4, January 31, 2019; Gov't Exhibit No. 3).

19. In response, the Defendant admitted to using PCP and stated that "the wet's mine." (Gov't Exhibit No. 3).

20. Officer Wagenhauser testified that he asked Mr. Griffith questions about drug usage for the purposes of medical attention. (Tr. at 68:12-17, January 31, 2019).

21. At the conclusion of the traffic stop, Officer Wagenhauser transported Mr. Griffith to the CPD for booking. (Tr. at 25:14-18, January 31, 2019). En route to the police department,

Officer Wagenhauser continued to converse with the Defendant and persisted in asking guilt seeking questions such as:

    a. "When did you first use PCP?"

    b. "Do you need to see a medic?"

    c. "Have you ever tried to get help?"

    d. "What are your pills for?"

    e. "What's the street talk?"

    f. "What's going on out there?"

(Tr. at 25:19-25; 59:18-19, January 31, 2019; Gov't Exhibit No. 3).

22. In response, Mr. Griffith stated that he "just smoked too much wet." (Gov't Exhibit No. 3).

23. Upon arrival to the police department, Mr. Griffith began to act aggressively and started hallucinating. (Tr. at 26:2-9, January 31, 2019; Gov't Exhibit No. 3). Concerned about the Defendant's health, Officer Wagenhauser transported him to the University of Missouri Hospital for examination and treatment. *Id.*

24. Mr. Griffith continued to act aggressively, and hospital security guards eventually restrained him to a hospital bed. (Tr. at 26:11-15, January 31, 2019). When the Defendant overheard Officer Wagenhauser explain to medical personnel that Mr. Griffith was in police custody for unlawful use of a weapon, the Defendant reacted by stating he only had the firearm to protect himself because the police were not going to do so. (Tr. at 27:2-14, January 31, 2019).

25. Mr. Griffith's statements, in conjunction with the recovery of the firearm and PCP from the glove box directly in front of where the Defendant was sitting in the vehicle, lead to a two count indictment charging him with being a felon in possession of a firearm and an unlawful drug user in possession of a firearm. (Doc. 1).

### III.     Discussion

Mr. Griffith challenges the constitutionality of both the initial investigative stop and the subsequent non-Mirandized statements he made after being placed in custody. In response, the Government argues that the traffic stop was supported by adequate reasonable suspicion. Moreover, the Government concedes that while a portion of Mr. Griffith's statements should be excluded due to a failure to administer *Miranda* rights, other spontaneous and voluntary statements

should nonetheless survive.  Lastly, the Government invokes the "routine booking" exception to argue that Officer Wagenhauser's non-Mirandized custodial questions regarding drug use were intended to ascertain Mr. Griffith's medical condition.  For the reasons that follow, Mr. Griffith's motion to suppress is granted in part and denied in part.

    *a. The investigative "Terry" stop was supported by reasonable suspicion.*

It is well established that a law enforcement officer can stop and briefly detain a person for investigatory purposes if the officer has reasonable suspicion that criminal activity "may be afoot." *Terry v. Ohio,* 392 U.S. 1, 25-31 (1968); *United States v. Lewis*, 864 F.3d 937, 946 (8th Cir. 2017). Reasonable suspicion requires officers "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 30. In other words, the presence of adequate reasonable suspicion to justify a *Terry* stop is determined by the "totality of the circumstances." *United States v. Wheat,* 278 F.3d 722, 731 (8th Cir. 2001) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less" than what is necessary to establish probable cause. *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (citation omitted); *Williams v. Decker*, 767 F.3d 734, 739 (8th Cir. 2014) (citation omitted). Suspicious activity justifying an investigative stop of a vehicle "need not conclusively prove guilt," rather "conduct consistent with both guilt and innocence may suffice." *United States v. Watts*, 7 F.3d 122, 125 (8th Cir. 1993). Reasonable suspicion for making an investigative traffic stop may therefore "be justified even if there are innocent explanations for a defendant's behavior." *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1998); *cf. United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1111 n.3 (8th Cir. 2007) (noting an officer's subjective motivations generally "play no role in analyzing the constitutional reasonableness of a stop under the Fourth Amendment"). "Once reasonable suspicion is established, a search of a vehicle's interior is permissible regardless of whether police have removed the occupants of the vehicle." *United States v. Navarrete-Barron,* 192 F.3d 786, 791 (8th Cir. 1999); *see United States v. Morgan*, 729 F.3d 1086, 1090 (8th Cir. 2013) (citation omitted).

As an initial matter, the Court finds the purported evasion of police contact cannot bolster the existence of reasonable suspicion.  Officer Wagenhauser testified that the Oldsmobile "attempt[ed] to evade" him, in part, by "abrupt[ly]" turning left at a four-way intersection and speeding up once he began his pursuit.  However, both dash and body camera footage appear to

directly contradict this testimony. (Gov. Ex. 3, 4). It is clear the vehicle came to a complete stop at the stop sign on Audubon Drive and kept a reasonable speed after turning. Regardless of the officer's subjective beliefs, the Court finds the vehicle objectively did not attempt to avoid police contact. Nonetheless, for the reasons discussed below, the totality of the circumstances justified the stop of the vehicle.

Here, reasonable suspicion existed to justify the initial traffic stop, primarily due to the information provided by the 911 call. The officer obtained dispatch notes containing information on a civilian report of a suspicious car parked in Shepard Park. The 911 caller stated that three individuals occupied a gray four-door Oldsmobile: a heavy-set black male wearing a white and black jacket with navy pants, a black female, and an unknown third subject. The caller deemed the vehicle to be "suspicious" because, in the vicinity of numerous children at the park, the vehicle "[drove] by several times" and ultimately parked near the public restrooms. The caller further stated that the occupants of the Oldsmobile kept getting in and out of the vehicle. The dispatch notes also indicate that the caller believed the description of the black male matched the description of a wanted burglary suspect. Armed with this information, the responding officer arrived near Shepard Park and shortly thereafter spotted a gray Oldsmobile leaving the area. Cumulatively, the 911 call describing suspicious activity and a wanted burglary suspect, coupled with the officer's visual identification of the make, model, and color of the vehicle, provided reasonable suspicion to initiate a stop.

As a consequence, both the handgun and illicit narcotics recovered from the vehicle are admissible. After initiating the traffic stop, Officer Wagenhauser learned that the driver did not have a valid driver's license. The officer also discovered that Mr. Griffith was on probation and parole for unlawful use of a weapon. And Mr. Griffith was known to possess weapons and drugs due in part to his local gang ties. The officer then decided to detain the occupants and search the interior of the vehicle. As noted above, the officer was authorized to search the vehicle after establishing reasonable suspicion. *Navarrete-Barron,* 192 F.3d 786 at 791. The search revealed a Taurus, .40 caliber, semi-automatic handgun and prescription bottle bearing Mr. Griffith's name in a locked glove box. The glove box was located directly in front of the Defendant's seat in the vehicle. Because the recovery of the gun and PCP were predicated by a valid *Terry* or investigative stop, such evidence may accordingly be admitted into evidence.

Mr. Griffith contends it is not illegal for three adults to go to Shepard Park while it is open to the public. That fact, in isolation, is certainly true. However, as detailed in *Tuley*, an investigative traffic stop may be justified even when there is an innocent explanation for the suspicious behavior. 161 F.3d at 515. Under the totality of the circumstances, the presence and behavior of three adults near a public restroom in a park meant for children, one of whom purportedly matched a burglary suspect, met the low threshold required to establish a reasonable suspicion of criminal activity.

> b. *Officer Wagenhauser's failure to administer the Miranda warning requires the exclusion of Mr. Griffith's statements.*

To protect an individual's Fifth Amendment privilege against self-incrimination, a custodial interrogation must be preceded by warnings of an individual's right to remain silent, that any statement may be used against him or her, and that he or she has the right to retained or appointed counsel. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). "The rule under *Miranda* prevents the government from using statements stemming from custodial interrogation of the defendant unless the government has used procedural safeguards effective to secure the privilege against self-incrimination." *United States v. Laurita,* 821 F.3d 1020, 1023 (8th Cir. 2016) (quoting *Miranda,* 384 U.S. at 444). *Miranda* rights are triggered when a defendant is being interrogated in police custody. *United States v. Swift,* 623 F.3d 618, 622 (8th Cir. 2010). The definition of interrogation extends "only to words or actions on the part of the police officers that they should have known were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980).

Generally, "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by officers." *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014) (quoting *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997). However, the Supreme Court has held that a "failure to administer *Miranda* warnings creates a presumption of compulsion." *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). "Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.*" *Id*. The exclusionary doctrine is most frequently applied to violations of the Fourth Amendment. *See Nix v. Williams,* 467 U.S. 431, 442 (1984). But the Supreme Court has applied the exclusionary rule to violations of the Fifth and Sixth Amendments "to deter police from violating constitutional and statutory protections." *Id.* at 442-43.

First, it is uncontested that Mr. Griffith (1) was placed in police custody before Officer Wagenhauser searched the interior of the vehicle; and (2) never received a *Miranda* warning. The Government further concedes that any questions asked while in the stationary patrol car relating to ownership of the gun, money, and PCP "were provided in response to custodial interrogation without the benefit of *Miranda* warnings." (Doc. 32 at 8). As such, the Court turns to Mr. Griffith's statements made both while he was being transported in Officer Wagenhauser's vehicle and during his stay at the University of Missouri Hospital.

Here, all of Mr. Griffith's statements must be suppressed. Mr. Griffith was undoubtedly in police custody after he was placed in a marked patrol car. Officer Wagenhauser's failure to provide *Miranda* warnings created a presumptively compulsive environment, and set an unconstitutional tone that dialogue–which often included interrogative and guilt-seeking questions–was permissible. The non-Mirandized interrogation that occurred in the patrol vehicle before transport to the police station established the tenor of the remainder of interactions between Mr. Griffith and Officer Wagenhauser, and the Defendant's statements accordingly cannot be deemed as entirely voluntary and spontaneous. Given that Mr. Griffith was arrested for unlawful use of a weapon and being a drug user in possession of a weapon, Officer Wagenhauser erred by asking questions regarding ownership of the gun and drugs without an appropriate *Miranda* warning. An officer's failure to follow basic constitutional principles should not be rewarded. The Court thus finds that all of Mr. Griffith's statements after the initial, non-Mirandized custodial interrogation should be excluded.

The Government contends several of Officer Wagenhauser's questions fall within the "routine booking exception" to *Miranda* that allows officers to ask questions related to a defendant's medical condition. (Doc. 32 at 12). Specifically, the Government argues that Officer Wagenhauser asking Mr. Griffith if he had taken any drugs was permissible. This particular issue appears to be one of first impression in the Eighth Circuit. The Government urges the Court to take a position similar to the Third Circuit and find Mr. Griffith's response to these questions admissible. *See United States v. Bishop*. 66 F.3d 359 (3rd Circ. 1995). Instead, the Court finds these statements excluded.

On multiple occasions, Officer Wagenhauser directly asked Mr. Griffth whether or not he used or was under the influence of PCP. As noted above, these questions regarding drug use were posed without a *Miranda* warning shortly after an arrest involving a weapon and illicit drugs.

Although a question regarding drug use could in some situations assist with booking procedures and medical care, here such questions appear to have been intended to discern Mr. Griffith's guilt, and seem to have been accusatory in nature. The Court is inclined to follow the First Circuit, where "the question of whether [a defendant] took any drugs does not fit within the purview of the routine booking exception." *United States v. Vicente*, No. 1:16-cr-00077-JAW, 2017 U.S. Dist. LEXIS 59430, at *10 (D. Me. Apr. 19, 2017). Accordingly, the Court finds that the "routine booking" exception does not apply to facts of this case. Therefore all of Mr. Griffith's statements after he was placed in police custody must be suppressed.

## IV. Conclusion

For the reasons stated above, the Court concludes that a portion of Mr. Griffith's contentions regarding suppression of evidence have merit, and the Motion to Suppress should be granted in part, and denied in part.

Accordingly, IT IS THEREFORE RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order DENYING defendant Dushane Kwmanie Griffith's motion to suppress as it pertains to the physical evidence recovered during the commission of a constitutionally permissible *Terry* or investigative stop. (Doc. 28).

IT IS FURTHER RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order GRANTING defendant Dushane Kwmanie Griffith's motion to suppress as to all statements made after the defendant was detained.

Each party has fourteen (14) days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve exceptions by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

Dated this 27th day of February, 2019, at Jefferson City, Missouri.

/s/ Willie J. Epps, Jr.
Willie J. Epps, Jr.
United States Magistrate Judge